**Cindy CARLSON, Plaintiff,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., a corporation, Defendant.**

**No. CV–98–122–GF.**

United States District Court,
D. Montana,
Great Falls Division.

Nov. 22, 1999.

Channing Hartelius, Hartelius, Ferguson, Baker & Kazda, PC, Great Falls, MT, Dale L. McGarvey, McGarvey, Heberling, Sullivan & McGarvey, Kalispell, MT, for Plaintiff.

William P. Conklin, Conklin, Nybo, LeVeque & Murphy, PC, Great Falls, MT, for Defendant.

## ORDER

MOLLOY, District Judge.

Magistrate Judge Cebull entered Findings and Recommendation in the above-captioned case on November 3, 1999, (docket # 37). Plaintiff filed objections to the Findings and Recommendation on November 15, 1999.

The crux of this claim is determining when a settlement agreement was reached in the case styled *Cindy J. Carlson and Regg A. Carlson v. Jeffrey D. Matthews and Farmers Insurance Exchange* brought in Montana's Eighth Judicial District. The date of settlement is crucial in determining if the case at bar alleging violations of Montana's Unfair Settlement Practices Act was timely filed. Bad faith claims by a third party claimant must be filed "within 1 year from the date of settlement of or the entry of judgment on the underlying claim." M.C.A. § 33–18–242(7):

Magistrate Cebull has carefully reviewed the facts and documentary evidence and determined that a settlement agreement between the parties in the heretofore mentioned suit was reached at a settlement conference on November 17, 1997. Plaintiff argues both in her motion for summary judgment and in her Objec-

tions to Judge Cebull's Findings and Recommendations that a "settlement" was not reached until December 10, 1998 when the formal release of claims was signed by the parties.

I agree with Judge Cebull's finding that a settlement had been reached on November 17, 1997. The release was not the settlement, but a term of the settlement. The oral agreement entered into by the parties on November 17, 1997 was an enforceable bilateral contract with executory duties on both sides. Plaintiff even concedes this point in her Objections to Judge Cebull's Findings. When the parties entered into an agreement before settlement master Robert Emmons, the underlying dispute had been settled, and the executory duties of the parties were later discharged by the full and complete performance of the parties in executing and abiding by the terms of the release.

I also agree with Judge Cebull's finding that the release is not a substituted or superseding contract since neither does the release expressly revoke the November 17, 1997 agreement nor impliedly do so by adding terms inconsistent with the intent of the parties on November 17, 1997.

▮ While it is true that the release language contains a minor revision to the memorialization of terms sent to the parties by Settlement Master Emmons on November 20, 1997, that distinction is immaterial for two reasons. First, a valid oral contract with all material terms had been reached at the settlement conference which was enforceable in settling the underlying claim. Second, such an agreement as was reached on November 17, 1997 constitutes a valid settlement under Montana law notwithstanding the later addition of subsidiary or collateral terms. *Hetherington v. Ford Motor Co.*, 257 Mont. 395, 399–402, 849 P.2d 1039 (1993).

I agree with Judge Cebull's recommendation that defendant's motion for summary judgment be granted and plaintiff's cross motion for summary judgment be

denied. I also find that Robert Emmon's affidavit is a clear and concise statement of facts within his knowledge and helpful in determining what the parties' understanding was on the day of settlement.

Accordingly, after *de novo* review of the record, I adopt in full the Findings and Recommendation.

Wherefore, IT IS ORDERED:

1) plaintiff's motion to strike the affidavit of Robert Emmons (docket # 31) is DENIED;

2) defendant's motion for summary judgment (docket # 18) that this action is barred by the one year statute of limitations set forth in M.C.A. § 33–18–242(7) is GRANTED;

3) plaintiff's cross-motion for summary judgment (docket # 22) is DENIED.

## REPORT & RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

CEBULL, United States Magistrate Judge.

Presently before the Court are cross-motions for summary judgment and Plaintiff's motion to strike the affidavit of Robert J. Emmons. After reviewing the briefs and applicable law, the Court is prepared to rule.

### *BACKGROUND*

This lawsuit alleges violations of the Montana Unfair Claims Settlement Practices Act (the "Act") by Defendant State Farm Mutual Automobile Insurance Company ("State Farm") in investigating and resolving Plaintiff Cindy Carlson's ("Carlson") personal injury claim. Carlson suffered injuries in a January 18, 1995, automobile accident in which Jeffrey Matthews ("Matthews") rear-ended her vehicle. At the time of the accident, State Farm insured Matthews under a liability policy providing bodily injury limits of $25,000.

Carlson sued Matthews for injuries sustained in the accident. She also sued Farmers Insurance Exchange ("Farmers"), claiming underinsured motorist coverage under the terms of her own policy. Farmers subsequently cross-claimed against Matthews asserting its subrogation right for any payments made to Carlson.

The parties attended a settlement conference conducted by attorney Robert J. Emmons on November 17, 1997. Attorney Lon Holden represented Matthews at the settlement conference. Both Carlson and her husband attended with their attorney, Channing Hartelius. Attorney Bill Gregoire attended on behalf of Farmers.

What happened next stands at the crux of the motions before the Court. The parties' characterizations notwithstanding, the Carlsons' and Matthews' representatives orally agreed to end the case against Matthews in exchange for the $25,000 limits under the State Farm policy and a "release." Mr. Emmons termed the agreement a "settlement" in a November 21, 1997, letter to Mr. Hartelius, Mr. Gregoire and Mr. Holden confirming its terms. The letter summarized the agreement as follows:

1. State Farm would pay $25,000 to the Carlsons for all claims against Matthews resulting from the January 18, 1995, collision;

2. The Carlsons would execute a general release to Matthews for all claims associated with the January 18, 1995, collision, but would reserve any claims against State Farm or Farmers;

3. Farmers would release Matthews from any subrogation claims and dismiss with prejudice its cross-claim against him; and

4. Mr. Hartelius would submit the necessary documents to "finalize" the claims between the Carlsons and Matthews.

Based upon these terms, Mr. Emmons believed the case had "settled." Aff. Robert Emmons p. 2–3. Mr. Holden wrote Mr. Hartelius confirming that, based upon Mr. Emmon's November 21, 1997, letter, he had requested a check from State Farm

payable to the Carlsons. The Carlsons executed the document releasing Matthews for $25,000 on December 10, 1997, after Mr. Hartelius effected what he termed a "minor" revision of the release reserving Carlson's claims against State Farm.

Carlson filed this statutory "bad faith" claim against State Farm on December 2, 1998, alleging violations of Mont.Code Ann. § 33–18–201(4) and (6). No one disputes that she is a third-party claimant in this action. As such, her claims are subject to the limitations period defined by § 33–18–242(7), which differentiates between first and third party claimants. In pertinent part, that section provides:

> (7) The period prescribed for commencement of an action under this section is: (a) for an insured, within 2 years from the date of the violation of 33–18–201; and (b) for a third-party claimant, within 1 year *from the date settlement of* or the entry of judgment on the underlying claim.

(Emphasis added).

The issue now before the Court is: what constitutes a "settlement" within the meaning of subsection (7)(b)? This question requires the Court: (1) determine whether a contract existed between the parties; (2) define "settlement"; and (3) determine whether the contract meets or exceeds the definition of "settlement" within the meaning of the Act. If the Court finds "settlement" occurred on November 17, 1998, Carlson's claim is barred by the one year limitation. However, if the "settlement" took place on or after December 10, 1998, the time to file did not expire and Carlson may proceed with the prosecution of her claim. Consideration of these is-

sues also allows the Court to gauge the propriety of Carlson's motion to strike the affidavit of Robert J. Emmons.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits[1], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue, and the evidence must be viewed in the light most favorable to the opposing party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In deciding a motion for summary judgment, the court cannot try issues of fact; it can only determine whether there are issues to be tried. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983) (quoting *Heyman v. Commerce & Ind. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975)).

### II. Date of the Settlement

Carlson's case hinges upon the definition of "date of the settlement" under Mont. Code Ann. § 33–18–242(7)(b) (1997). "Date of the settlement" is not defined by the statute and is conspicuously absent from the Act's legislative history. *See* Ch. 278, H.B.240 (1987). However, Montana case law and common practice guide this Court in articulating the intended and practical meaning of subsection (7)(b).

---

1. The Court reminds Plaintiff's counsel that Fed.R.Civ.P. 56(e) limits "the matter to be properly included in an affidavit to facts, and the facts introduced must be alleged on personal knowledge. Thus, ultimate or conclusory facts and conclusions of law ... cannot be utilized in a summary-judgment motion ... an attorney's affidavit is admissible only to prove facts that are within the attorney's personal knowledge and as to which the attorney

is competent to testify." 10B Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2738 (3d ed.1998). Mr. Hartelius' affidavit argues numerous cases and points of law, and is more akin to a brief than an affidavit. The Court considered his affidavit with the aforementioned principles in mind and suggests the parties avoid the submission of similarly styled affidavits in the future.

## A. The Contract Theory Of Settlement

An interim agreement to resolve pending litigation without a contemporaneous dismissal or release is an enforceable executory accord and constitutes a valid settlement. *See Hetherington v. Ford Motor Co.*, 257 Mont. 395, 399–402, 849 P.2d 1039, 1042–1044 (1993). In that case, plaintiffs entered into an oral settlement agreement with defendants for $185,000, only to discharge their attorney and retract the acceptance four days later. *Id.* at 1041. Plaintiffs premised the retraction on "their understanding that 'our right to bring the claim ... would not be lost until that written settlement agreement was formally approved and executed.' " *Id.* After retraction, plaintiffs filed a lawsuit to which defendant pled the previous settlement as an affirmative defense and filed a counterclaim seeking specific performance of the alleged contract. *Id.*

Defendant moved for summary judgment on its counterclaim, which the district court denied; the court based the denial upon what it considered a question of fact as to whether the parties intended to be bound absent the signed agreement. *Id.* Then, relying in part upon plaintiffs' purported intention to give up their claim only after signing the written agreement, the district court directed a verdict for plaintiffs on the basis that "no meeting of the minds had occurred concerning what an 'appropriate release' provision in the settlement agreement would have included." *Id.* at 1041–42.

The Montana Supreme Court reversed on the issue of intent. First, it noted that nothing in the plaintiff's attorney's letter or statements at the conference indicated manifestations of conditional intent. *Id.* at 1042. The Court further held:

> The intentions of the parties are those disclosed and agreed in the course of negotiations. A party's latent intention not to be bound does not prevent the formation of a binding contract. Such a condition, that it will not be effective until signed, must be part of the agreement between the parties.

*Id.* (citing *Hanson v. Oljar*, 231 Mont. 272, 277, 752 P.2d 187, 190 (1988); *Hunt v. SY Cattle Co.*, 75 Mont. 594, 606, 609, 244 P. 480 (1926)). Thus, no question of fact existed as to whether the parties intended to be bound by the written agreement only. *Id.*

The Court next leveled its analysis upon whether or not the definition of an "appropriate release" thwarted the "meeting of the minds" necessary to contract. Defendant's agent testified that the "appropriate release" referenced a standard release, whereas plaintiffs testified that the terms of defendant's proposed release would have been unacceptable and "particularly repugnant." *Id.* It was upon these distinctions that the district court found the parties failed to reach a common understanding as to the contract terms. *Id.* Reversing, the Court reasoned, "[a] contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect if it can be done without violating the intention of the parties." *Id.* at 1042–43 (quoting Mont.Code Ann. § 28–3–201). It further held that the two material elements of the settlement agreement were: (1) the amount of the settlement, or $185,000; and (2) the release of all claims. *Id.* at 1043. Defendants offered to pay the $185,000 in exchange for a "full and final release of all claim." *Id.* Plaintiffs accepted the amount offered and requested an "appropriate release." *Id.* Weighing these facts, the Court determined that "[s]uch material elements are capable of being carried into effect and will not violate the intentions of the parties ... '[m]atters which are subsidiary, collateral, or which do not go to the performance of the contract, are not essential and do not have to be expressed in the contract.' " *Id.* (quoting *Steen v. Rustad*, 132 Mont. 96, 105, 313 P.2d 1014, 1020 (1957)). Thus, the "release" ultimately signed by the parties would effect the same result regardless of the ways in which it was initially characterized; the labels supplied by the parties

did not constitute a material dispute upon which the contract would be defeated.

The Court next addressed whether the settlement agreement constituted an executory accord or a substituted contract. *Id.* It described an executory accord as "a contract which provides for the acceptance in the future of a stated performance and satisfaction of the antecedent claim." *Id.* The Court further noted that, "[a]n executory accord is an interim agreement and if it is not executed the original obligation remains." *Id.* at 1044. Conversely, a substituted contract existed if "the agreement arrived at by the parties is itself accepted as a substitution for an extinguishment of the antecedent claim . . . the old claim is extinguished and recovery is limited to rights under the substituted contract." *Id.* at 1043–44 (citing *Clark v. Elza*, 286 Md. 208, 406 A.2d 922 (1979); 6 *Corbin On Contracts* § 1268, p. 71 (1962)).

Plaintiffs labeled the settlement an executory accord and argued it was not a legally binding contract until payment was made. *Id.* This, however, contravened Montana law on accords, which provides:

> Accord—definition and effect. An accord is an agreement to accept in extinction of an obligation something different from or less than that to which the person agreeing to accept is entitled. Though the parties to an accord are bound to execute it, yet it does not extinguish the obligation until it is fully executed.

*Id.* at 1044 (quoting Mont.Code Ann. § 28-1–1401 (1991)). The parties were therefore bound to execute the agreement, though defendant's obligation was not extinguished until completion of the accord. *Id.* The Court passed upon defining the agreement as an executory accord or a substituted contract because plaintiffs breached, not defendant; regardless of the characterization, the Court concluded "the interim agreement is enforceable and not an incomplete accord and satisfaction . . . we find the interim contract is specifically enforceable . . . ." *Id.* at 1044.

■ Although the Montana Supreme Court applied *Hetherington* in a context not seen here, the facts and issues are identical to those of this case. Moreover, it is consistent with other jurisdictions finding oral settlement agreements enforceable at the time promises are exchanged. *See Clark*, 406 A.2d at 928. In *Clark*, the parties orally agreed to a settlement; plaintiffs subsequently returned a written agreement unsigned, stating the amount was no longer adequate. *Id.* at 923. The trial court refused to enforce the settlement on the grounds that it was an executory accord, not a substituted contract. *Id.* at 923–24. Reversing, the Court of Appeals reasoned:

> . . . it is logical to hold that executory accords are enforceable. An executory accord is simply a type of bilateral contract. As long as the basic requirements to form a contract are present, *there is no reason to treat such a settlement agreement differently than other contracts which are binding.* This is consistent with the public policy dictating that courts should 'look with favor upon the compromise or settlement of law suits in the interest of efficient and economical administration of justice and the lessening of friction and acrimony.'

*Id.* at 928 (Emphasis added) (quoting *Chertkof v. Harry C. Weiskittel Co.*, 251 Md. 544, 248 A.2d 373, 377 (1968)); *see also Calabi v. Government Employees Ins. Co.*, 353 Md. 649, 728 A.2d 206, 208 (1999) ("A valid settlement agreement is a type of contract."). Thus, once the parties strike a settlement agreement, either may enforce it. *See Calabi*, 728 A.2d at 208. The foregoing authority demonstrates Matthews and the Carlsons entered into a binding bilateral contract at the November 17, 1997, settlement conference. The oral agreement between the parties provided for the acceptance in the future of a stated performance and satisfaction of the Carlsons' claims. Here, the stated future performance was the $25,000 payment and release. The Court is therefore presented

with a textbook example of an executory accord.

Carlson's arguments to the contrary mirror those rejected by the *Hetherington* Court. First, if Carlson did not intend to be bound by the oral agreement and bore the impression that she would not be bound absent a written agreement, she should have stated that intention. However, the record demonstrates no manifestation of conditional intent, as evidenced by Mr. Emmon's November 20, 1998, confirmation letter. That letter set forth the terms of the "settlement"; conspicuously absent was reference to the necessity of a written agreement or that Carlson refused to be bound without one. This is also supported by Robert Emmon's affirmation that "[a]t no time did the plaintiffs or their attorney disclose to me that plaintiffs, the Carlsons, did not intend to be bound by the settlement agreement until a formal release was exchanged for the settlement check." Aff. Robert Emmons p. 2–3. Without such statement, her intentions were latent ones for which the law will not permit her to subsequently foreswear the contract. Accordingly, the Court finds the parties intended to be bound upon the oral exchange of promises, not a subsequent written agreement.

Carlson's claim that no contract existed for want of an agreement regarding the terms of release is also rebutted by Montana law. As noted in *Hetherington*, the material terms of the Matthews–Carlson contract were: (1) the amount of settlement, here $25,000, and (2) the release. All parties agreed to a "release." Although the release was a material element, the terms of the release were not. The applicable law, cited by the *Hetherington* Court in dismissing the argument Carlson presents, bears repeating: "[m]atters which are subsidiary, collateral, or which do not go to the performance of the contract, are not essential and do not have to be expressed in the contract." *Hetherington,* 849 P.2d at 1043 (quoting *Steen,* 313 P.2d at 1020). Furthermore, Carlson's claim that a material controversy existed regarding the reservation of her claims

against State Farm is rebutted by Mr. Hartelius' December 3, 1997, letter to Mr. Holden, which read, "[p]lease find enclosed revised release [*sic* ] in the Carlson matter. I have made *a few minor revisions* reserving the claims against State Farm which were reserved." (Emphasis added).

■ Carlson also states that the personal injury claim could not have been "settled," because the claim was not "extinguished" or absolutely resolved at the conclusion of the November 17, 1997, conference. Again, she misapprehends the scope and binding effect of a bilateral contract. Courts have noted:

... while [an oral] agreement to compromise [is] binding and enforceable against a defaulting party barring plaintiff from proceeding with his original action in breach of the agreement plaintiff [does] not entirely relinquish his original cause upon entering into the agreement of compromise. The tort action would only be conclusively terminated when [payment is made] against delivery of the releases and dismissal stipulation; until then it *remained in abeyance and if defendant repudiated the settlement or committed a material breach of its terms,* plaintiff could elect either to sue [on the amount owed] or to rescind and press forward upon the original cause.

*Warner v. Rossignol,* 513 F.2d 678, 683 (1st Cir.1975); *see also Hetherington,* 849 P.2d at 1044. It is true that Carlson's claim was not "conclusively terminated" at the settlement conference. However, the executory accord preserves the parties' underlying cause of action in the event of breach. A contemporaneous dismissal or release is unnecessary. If the accord is breached, the underlying cause of action is revived. Restatement (Second) of Contracts § 281(2) cmt. b (1981). The Court finds no breach justifying revival or postponement of the date of contracting.

■ The Court also finds as unpersuasive Carlson's contention that the release superseded the oral agreement. This is a

parol evidence argument and would be well-taken if the Court were interpreting contract terms. This, however, is not the case. Rather, the Court is charged with determining *if and when* the parties entered into a binding bilateral contract. Assuming, arguendo, that Carlson's parol evidence argument were applicable and the parties' release superseded the oral agreement, it could not retroactively alter the enforceability of the oral agreement. The Montana Supreme Court has reasoned:

> Where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, the fact, alone, that it was the understanding that the contract should be formally drawn up and put in writing, *did not leave the transaction incomplete and without binding force,* in the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed.

*Hunt,* 244 P. at 483 (1926) (Emphasis added); *see also A.T. Klemens & Son v. Reber Plumbing and Heating Co.,* 139 Mont. 115, 119, 360 P.2d 1005, 1006 (1961). Had State Farm reneged on its promise to pay the $25,000 following the settlement conference, the Carlsons could have sought specific performance of the contract. For the purposes of this inquiry, an oral contract is as powerful as a written one. *See Keil v. Glacier Park, Inc.,* 188 Mont. 455, 460, 614 P.2d 502, 505 (1980) (citing Mont. Code Ann. § 28–2–901) ("[a]ll contracts may be oral except as are specially required by statute to be in writing.").

For this reason, the Court also rejects Carlson's attempt to strike the affidavit of Robert J. Emmons, which is founded upon the same misunderstanding of the parol evidence rule. Moreover, Carlson cites no acceptable authority for the proposition that this Court may not consider the affidavit. The Court finds the argument without support in fact or law.

■ Carlson's reliance upon the doctrine of estoppel is also misplaced. Equitable estoppel exists to prevent a party from taking unconscionable advantage of his own wrong. *In re Marriage of K.E.V.,* 267 Mont. 323, 331, 883 P.2d 1246, 1251 (1994). "Estoppel is not favored and will only be sustained upon clear and convincing evidence." *Id.* (quoting *Kenneth D. Collins Agency v. Hagerott,* 211 Mont. 303, 310, 684 P.2d 487, 490 (1984)); *see also Billings Post No. 1634 v. Montana Dept. of Revenue,* 284 Mont. 84, 90, 943 P.2d 517, 520 (1997) ("clear and convincing evidence is necessary to establish equitable estoppel.").

■ Equitable estoppel requires the satisfaction of six essential elements: (1) the alleged conduct, acts, language or silence amount to the representation or concealment of a material fact; (2) the facts are known to the party at the time or imputed to him; (3) the truth must be unknown to the party invoking the doctrine; (4) the conduct must be intended or expected to be acted upon by the other party, or the circumstances demonstrate that it is natural and probable that it be acted upon; (5) the conduct must be relied upon by the aggrieved party; and (6) he must act upon it so as to change his position for the worse. *Dagel v. City of Great Falls,* 250 Mont. 224, 235, 819 P.2d 186, 193 (1991). All six elements must be established before the doctrine is invoked. *Elk Park Ranch v. Park County,* 282 Mont. 154, 166, 935 P.2d 1131, 1138 (1997).

■ Plaintiff's counsel essentially argues that State Farm represented to Carlson, through its course of conduct, that the settlement took place on or after December 10. Plaintiff's counsel also states that, because he had no idea that State Farm would attempt to "back date" the settlement, State Farm should be estopped from denying the settlement occurred earlier than the December date offered by Carlson. However, the Court finds no evidence in the record, clear and convincing or otherwise, that State Farm's counsel misrepresented the terms or date of the agreement. Simply put, the required elements of estoppel are absent, and the

claim is rejected. *See Billings Post No. 1634*, 943 P.2d at 522 (district court properly refused equitable estoppel claim where party failed to establish the necessary elements).

### B. *The Plain & Common Meaning Of "Settlement"*

▇▇▇ Having found the existence of a binding contract, the Court's inquiry turns to the definition of "settlement." The Court may explore the natural, plain and obvious meaning of terms in controversy. *See Mountain States Telephone & Telegraph Co. v. Commissioner of Labor & Industry*, 187 Mont. 22, 50, 608 P.2d 1047, 1062 (1979). "It is a well-established rule of statutory construction that a statute is to be read as a whole and construed so as to avoid absurd results." *Clover Leaf Dairy v. State*, 285 Mont. 380, 388–89, 948 P.2d 1164, 1169 (1997); *see also Pacific Mutual Life Ins. Co. v. American Guaranty Life Ins. Co.*, 722 F.2d 1498, 1500 (9th Cir.1984) ("[i]nterpretative constructions of a statute which would render some words surplusage, defy common sense, or lead to mischief or absurdity are to be avoided."), *overruled on other grounds by In re McLinn*, 739 F.2d 1395 (9th Cir.1984).

Courts often refer to common reference sources in assigning meaning to undefined statutory terms. For example, the Montana Supreme Court in *Mountain States Telephone & Telegraph* cited Websters and Blacks Law dictionaries as authority in defining a number of terms under the Maternity Leave Act. 608 P.2d at 1062. Thus, everyday definitions may be used to work a common-sense and equitable solution in the absence of controlling law. Similarly, here, the Court finds the dictionary definitions of "settlement" and other related terms especially compelling. The Superior Court of New Jersey, Law Division considered these definitions as follows:

> 'Payment' is not synonymous with 'settlement.' 'Payment' means the act of paying, that is, to discharge indebtedness for; to make disposal of money; to make compensation for. *See* Webster's Seventh Collegiate Dictionary; also 31A Words and Phrases et seq. 'Settlement' means to fix or resolve conclusively; to make or arrange for final disposition. *See* Webster, supra; also 39 Words and Phrases 65 et seq.

*Wager v. Burlington Elevators, Inc.*, 116 N.J.Super. 390, 282 A.2d 437, 441 (1971). Here, the November 17, 1997, agreement arranged the final disposition of the case. Still another reference source describes "settlement" as "decid[ing] (a lawsuit) by mutual agreement of the involved parties without court action." American Heritage Dictionary 1652 (3d ed.1996). The phrases "fix or resolve conclusively," and "decide by mutual agreement" readily square with the creation of a bilateral contract. *See* Alyson M. Weiss, *Federal Jurisdiction To Enforce A Settlement Agreement After Vacating A Dismissal Order Under Rule 60(b)(6)*, 10 Cardozo L.Rev. 2137, 2141 (1989) ("many courts have taken the approach that a settlement is as binding, conclusive and final as if it had been entered in a judgment.") Review of legal reference sources also supports this interpretation:

> **Settlement.** Act or process of adjusting or determining; an adjusting; an adjustment between persons concerning their dealings or difficulties; an agreement by which parties having disputed matters between them reach or ascertain what is coming from one to the other; arrangement of difficulties; composure of doubts or differences; determination by agreement; and liquidation.

Black's Law Dictionary 1231 (5th ed.1979). Post-conference correspondence between the parties' representatives reflects an understanding that these definitions of "settlement" governed the agreement, and is further confirmed by Mr. Emmon's affidavit.

▇▇▇ Based upon the foregoing definitions and the admonition that this Court avoid interpretations that "defy common sense, or lead to mischief or absurdity," the Court determines that "date of the

settlement" is the date when *a binding contractual agreement is made through which the parties arrange for final disposition of the case.* "Contractual agreement" refers to any enforceable contract. So long as the promised exchange is an enforceable one, the Court need not engage in the semantic exercise of categorizing the contract before it. Thus, when the parties create an enforceable bilateral contract and vest in one another the right to sue for breach of that contract, the case has "settled" within the meaning of subsection (7)(b). This precisely describes the circumstances surrounding the November 17, 1997, settlement conference. The idea that a party could sue for the specific performance of an "unsettled" claim contravenes the plain meaning of the term and the law of contracts.

## CONCLUSION

Based upon the foregoing,

**IT IS RECOMMENDED** that State Farm's motion for summary judgement be **GRANTED,** and Carlson's cross-motion for summary judgment and motion to strike the affidavit of Robert J. Emmons be **DENIED.**

The parties are advised that pursuant to 28 U.S.C. § 636, any objections to these findings must be filed with the Clerk of Court and copies served on opposing counsel within ten (10) days after receipt hereof, or objection is waived.

November 3, 1999.